**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 27, 2017**

# In the Court of Appeals of Georgia

A17A1082. ROSS v. THE STATE.                                D0-037C

DOYLE, Judge.

After a jury trial, Deandre Ross was found guilty of two counts of aggravated assault[1] and two counts of possession of a firearm during the commission of a felony[2] stemming from a drug transaction turned robbery. Ross filed a motion for new trial, which he later amended. After a hearing, the trial court denied the motion, and this appeal followed. . Ross argues that the trial court erred by failing to instruct the jury that accomplice testimony must be supported by corroborating evidence pursuant to OCGA § 24-14-8. For the reasons that follow, we reverse.

---

[1] OCGA § 16-5-21 (a) (2).

[2] OCGA § 16-11-106 (b) (1).

Viewed in favor of the verdict,[3] the record shows that Ross, Charles Holmes, and Kelvin Dukes were indicted together based on a shooting that occurred during an alleged attempted drug buy at the apartment of Myron Glenn.[4] Glenn testified that an individual he knew only as "Kinfolk" set up large marijuana purchases at Glenn's apartment for which Glenn was paid a small fee. To facilitate this particular sale, Glenn called Holmes and told him to bring over two pounds of marijuana to sell to Kinfolk. Kinfolk later arrived at Glenn's apartment with Dukes, but the two left to obtain cash to buy the marijuana and to pick up Ross, who supposedly had eight pounds of marijuana to sell to Kinfolk and Dukes along with the two pounds they were going to buy from Holmes.

When Holmes arrived at Glenn's apartment, Glenn called Kinfolk to let him know that the two pounds of marijuana had arrived. Kinfolk told Glenn that he had

---

[3] See *Huff v. State*, 300 Ga. 807 (796 SE2d 688) (2017). See also *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[4] Ross was charged with aggravated assault against Holmes and Glenn. Holmes was charged with two counts of aggravated assault against Ross and Dukes, one count of possession of a firearm during the commission of a felony, and possession of marijuana with intent to distribute; he pleaded guilty immediately prior to trial to the two possession charges. Holmes testified on behalf of the State in the instant case. Dukes was charged with two counts of aggravated assault against Holmes and Glenn, six counts of forgery, and two counts of possession of a firearm during the commission of a felony, and he was found guilty on all counts.

2

been held up waiting on another person, but that Dukes and Ross would be back over to complete the transaction with Holmes. Glenn testified that Holmes was in the kitchen, and Glenn looked out the window, where he saw Dukes and Ross pull up in a black car. Dukes came up to the apartment to check and make sure everything was okay, then went back down to the car, and Glenn sat on the couch in the living room. Glenn was not anticipating that any of his family would be at home, but his stepson, R. S., came in through the door, and Glenn closed R. S. in his bedroom before Dukes and Ross returned.

Glenn testified that Ross came back up to the apartment again, and then went down to the car again, and Glenn double checked that his stepson's door was closed. Glenn testified that at this point, Ross "busted in the door with two revolvers in my face and was like 'Get down, get down, get down."[5] Glenn testified that Dukes also entered the apartment, pulled out his gun, and walked toward Holmes in the kitchen. Glenn got on the ground, Ross and Dukes switched positions so Ross went toward the kitchen and Holmes, and Dukes came toward him. As Ross walked toward the kitchen, Glenn heard him say "whoa, whoa, hey, hey," and then gunfire erupted.

---

[5] On the day of the incident, Glenn told police that Ross entered the apartment with a single weapon.

3

Glenn testified that when the gunfire subsided, he got up to look for R. S., Dukes jumped out of a window, and Ross staggered out the door of the apartment; Holmes also exited through the apartment door, and Glenn ran down the steps past Holmes to try and find R. S. Glenn testified that while he was looking for R. S., his neighbors told him that Ross was trying to leave in the black car, so Glenn took the car keys and pulled Ross from the car. Glenn also saw Dukes lying on the ground motionless underneath the apartment window. Glenn denied owning a weapon but admitted that he had nine millimeter ammunition in his home. Glenn was not shot during the incident.

Holmes testified that he regularly purchased marijuana for his own use from Glenn, he denied ever selling marijuana, and he admitted he was present during the time of the shooting to make a purchase along with another individual known to him as "Glitter Piece."[6] Holmes testified that when he and Piece entered Glenn's apartment, Dukes was already there, sitting on the sofa, and Glenn was standing up; Glenn's stepson arrived and went straight to his bedroom. Holmes testified that he went to the kitchen, and Ross entered the apartment, quickly looked around, and then

---

[6] Holmes testified that his girlfriend, Tiffany Story, remained in Holmes's vehicle while Holmes and Piece went up to Glenn's apartment.

4

exited after saying something about going to the car to get the money. Holmes testified that Ross quickly returned, looked around, and brandished a single, small caliber revolver, telling Holmes to get on the floor. Holmes got to the floor, and Ross turned to the living room; Holmes took the opportunity to take out his own Taurus nine millimeter handgun and get up, but as he did so, Ross fired one shot at him before Holmes shot Ross multiple times in the chest. While he was firing at Ross, Holmes also heard gunfire coming from the living room, but he was not sure if it was Glenn, Piece, or Dukes; he did not see Dukes with a weapon but did see Glenn with one. Holmes saw Dukes go out the window, but he was not clear as to whether the man was pushed, jumped, or fell after being shot. After sustaining gunshot wounds, Holmes eventually made his way out of the apartment and ran down with Piece to his car, which Story was driving; the trio left the complex and drove off. They went to a gas station, where only Holmes remained and called police. After being asked how he sustained his wounds, Holmes said that he was shot during an attempted robbery as he walked down the street.

R. S. testified that when he arrived at the apartment, there was someone there in addition to Glenn, who was in the kitchen. A few minutes later, R. S. heard yelling

and the words "get down" and then heard gunshots, at which point he jumped out of his bedroom window.

When police responded, Dukes was lying in the bushes underneath the window from which he fell. Dukes suffered approximately ten gun shot wounds — eight to his front and at least two in his back — and counterfeit money was found near and in the bushes where he was found as well as in his pockets when he was taken to the hospital for treatment. Ross suffered numerous gunshot wounds to the legs and one to the head, but he was not shot in the chest. No residue test was performed on Dukes or Ross; no fingerprints were discovered on the firearms from the scene. Over $2,000 in legal U. S. currency was found in Holmes's clothing at the hospital.

Approximately eight ounces of marijuana was found at the scene. Blood was found on the exterior landing, stairs, sidewalk, pavement, and inside the apartment; the blood on the landing was matched to Ross, and blood from Dukes and Holmes was discovered elsewhere as well as blood from an unknown individual. A firearms expert testified that based on the nine-millimeter shell casings recovered from the scene, two different makes of nine-millimeter handgun were fired during the altercation. No 9-millimeter handguns were recovered from the scene, but two weapons — a Ruger 22-caliber revolver and a Smith & Wesson 32-caliber revolver

6

were recovered and linked to the shooting; no projectiles from those weapons were found on the scene except in the weapons themselves. The firearms expert also testified that a 40-caliber weapon not found at the scene was used to fire at least one 9-millimeter casing recovered from the scene. A search of Ross's vehicle uncovered his wallet, Ross's identification, counterfeit U.S. currency, and Dukes's wallet. No marijuana, weapons, or ammunition was discovered in Ross's vehicle. Several 911 calls were presented to the jury, including one from a woman who said she was on the phone with an individual named "D" when she heard gunshot wounds and was cut off from the call, and one purportedly from Ross, stating that he was being shot.

In its charge to the jury, the trial court stated that "[t]he testimony of a single witness if believed is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness, provided you find the evidence to be sufficient." It is undisputed that the trial court did not charge the jury that the testimony of an accomplice must be corroborated by other evidence.[7]

---

[7] See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2014), § 1.31.92 (charging the jury that accomplice testimony must be corroborated with evidence, even slight, from some other source, that the determination of whether a witness is an accomplice is a matter for the jury, and that the determination of whether the evidence is sufficient to corroborate the accomplice is for the jury).

In his sole enumeration of error on appeal, Ross argues that the trial court committed plain error by failing to instruct the jury on the necessity of corroboration of accomplice testimony as required by OCGA § 24-14-8. Ross contends that the only testimony connecting him and Dukes to the alleged counts of aggravated assault came from Glenn and Holmes, both individuals who could have been considered by the jury to be Ross's and Dukes's accomplices in the common criminal enterprise of the drug sale at Glenn's home.[8]

"[I]t is error for a trial court to refuse to give a requested instruction on accomplice corroboration, [but because Ross] did not request such a jury instruction, reversal depends on whether he can meet the plain error test."[9] This test requires the following:

---

[8] See *Selvidge v. State*, 252 Ga. 243, 244-254 (2) (313 SE2d 84) (1984) ("In cases [in which conspirators] have acted pursuant to a common criminal enterprise and one or both are testifying against the other, the opportunity and motives for perjury which present themselves are essentially the same as those in criminal prosecutions involving the traditional forms of accomplices, and the testimony should be afforded the same measure of distrust.").

[9] (Citations and punctuation omitted.) *Lyman v. State*, 301 Ga. 312, 316 (2) (800 SE2d 333) (2017), quoting *Hamm v. State*, 294 Ga. 791, 795 (2) (756 SE2d 507) (2014) (overruling prior cases that held it was not error for the trial court to refuse to give the accomplice corroboration instruction if the State presents independent corroborating evidence because sufficiency of the evidence is a distinct inquiry to the necessity of the jury instruction to properly guide the jury).

First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. [10]

As an initial matter, there was some evidence from which the jury could determine that Dukes and Ross were accomplices of Glenn and Holmes.[11] There was no affirmative waiver of the accomplice corroboration requirement by Ross, and the failure to give the charge in this case "was clear error not subject to reasonable dispute."[12] "The trial court's instructions deviated from a legal rule . . . [in OCGA 24-

---

[10] (Punctuation and emphasis omitted.) *Lyman*, 301 Ga. at 316-317 (2), quoting *Cheddersingh v. State*, 290 Ga. 680, 683 (2) (724 SE2d 366) (2012).

[11] See, e.g, *Lyman*, 301 Ga. at 316-317 (2); *Fisher v. State*, 299 Ga. 478, 485 (2) (a) (788 SE2d 757) (2016); *Selvidge*, 252 Ga. at 244-254 (2).

[12] *Stanbury v. State*, 299 Ga. 125, 129 (2) (786 SE2d 672) (2016). See also *Lyman*, 301 Ga. at 317 (2), citing *Hamm*, 294 Ga. at 796 (2).

14-8,] which unequivocally require[s] corroboration of accomplice testimony in felony cases. . . . Therefore, the first two prongs of the [plain error] test are met."[13]

"The third prong of the . . . plain error test requires that the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings."[14] Ross argues that if the proper jury instruction had been given, he would have been acquitted of aggravated assault because the only evidence showing that he or Dukes brandished or fired weapons was the testimonies of Glenn and Holmes. We agree. Holmes admitted he fired on Ross using a 9-millimeter weapon and claimed Glenn was firing at the other individuals; while Glenn denied having a weapon, he admitted to possessing 9-millimeter ammunition and investigators discovered evidence of at least two 9-millimeter weapons being used at the altercation. Neither Glenn nor Holmes claimed that Ross or Dukes brandished 9-millimeter weapons, and no forensics, testimony, or records linked either Dukes or Ross to the weapons outside of Glenn's and Holmes's testimonies. Moreover, Ross and Dukes both sustained numerous gunshot wounds each while Glenn was uninjured and Holmes was shot once; based

---

[13] (Citation and punctuation omitted.) *Stanbury*, 299 Ga. at 130 (2).

[14] (Punctuation omitted.) Id., quoting *Cheddersingh*, 290 Ga. at 685 (2).

10

on analysis of the revolvers, it did not appear that either had been fired during the altercation. Additionally, Glenn maintained he did not sell marijuana, which was at odds with Holmes's testimony. And while Glenn testified that no one else was involved in the shooting aside from himself, Holmes, Dukes and Ross, Holmes testified that his friend Piece was there and could also have fired a weapon. Holmes also testified that Dukes was sitting on the sofa with Glenn when Holmes and Piece arrived before Ross showed up alone, which description was contrary to Glenn's testimony that Dukes and Ross came in together after Holmes was already present. Finally, although Holmes contended that he was there only to purchase a small amount of marijuana, investigators found $2,000 in his personal effects at the hospital.

The State argues that the accomplice instruction was unnecessary because assuming that both Glenn and Holmes were accomplices, when "more than one accomplice testifies at trial, the testimony of one accomplice may be corroborated by the testimony of the others."[15] While it is true that the testimony of more than one

---

[15] (Punctuation omitted.) *Ramirez v. State*, 294 Ga. 440, 442 (754 SE2d 325) (2014) (addressing sufficiency of evidence based on the testimony of more than one accomplice), citing *Hanifa v. State*, 269 Ga. 797, 808-809 (7) (505 SE2d 731) (1998) (same). See also *Clark v. State*, 296 Ga. 543, 547 (1) (d) (769 SE2d 376) (2015) (same).

accomplice can serve as sufficient evidence of the commission of a crime, the cases cited by the defense do not address the failure of the trial court to provide the necessary instruction to the jury prior to its deliberations. In this instance, the trial court's instruction to the jury that the testimony of a single witness could support a fact left open the possibility that the jury believed either Glenn's testimony as Ross's accomplice or Holmes's testimony, disbelieved the other witnesses' testimony entirely, and therefore, convicted him based solely on the testimony of one accomplice.[16] Moreover, because the only testimony connecting Ross to the commission of aggravated assault against either Glenn or Holmes or to the possession of firearms during the commission of felonies was the testimony of Glenn and Holmes, it cannot be said that reversal is not required in this instance.

*Judgment reversed. Reese, J., concurs. Miller, P. J., concurs in judgment only.*

---

[16] See *Fisher*, 299 Ga. at 487-489 (2) (b); *Stanbury*, 299 Ga. at 130-131 (2); *Burns v. State*, __ Ga. App. __ (1) (Case No. A17A0333; decided Jun. 27, 2017). Compare with *Lyman*, 301 Ga. at 318-319 (2) (failure to give instruction was harmless given multiple non-accomplice sources linking defendant to the crime); *Huff*, 300 Ga. at 810-812 (2) (explaining that the trial court's failure to instruct the jury on accomplice corroboration was not plain error because the trial court also failed to charge the jury that "the testimony of a single witness, if believed, is generally sufficient to establish a fact"); *Hamm*, 294 Ga. at 796-798 (2) (failure to instruct was harmless because two independent, non-accomplice sources linked the defendant to the killing).