311 Ga. 232
FINAL COPY

S21A0084. PINDLING v. THE STATE.

PETERSON, Justice.

Michael Pindling was convicted of malice murder and other crimes in connection with the shooting death of Robert Pett.[1] On appeal, Pindling argues that the trial court plainly erred when instructing the jury that a single witness's testimony was sufficient

---

[1] Pett was found dead on July 13, 2013. In September 2013, a Lowndes County grand jury indicted Pindling and Deron Wallace for malice murder, felony murder predicated on aggravated assault, aggravated assault, armed robbery, possession of a firearm during the commission of a felony, and two counts of theft by taking. The grand jury also indicted Kathryn Cortez for armed robbery and possession of a firearm during the commission of a felony. After Pindling and Wallace's joint trial in May 2014, a jury found Pindling guilty on all counts and Wallace guilty on all counts except malice murder. On July 27, 2014, the trial court sentenced Pindling to life in prison without the possibility of parole for malice murder, a consecutive life term for armed robbery, and a consecutive five-year term for the firearm count; the trial court initially entered sentences on the theft counts but later vacated the sentences for these counts, and the remaining counts were vacated by operation of law or merged for sentencing purposes. Pindling filed a motion for new trial on July 14, 2014. Pindling filed a notice of appeal before his motion was decided, and we dismissed his appeal as premature. Pindling thereafter amended his motion for new trial, which the trial court denied on December 8, 2017, following a hearing. Pindling timely appealed, and his case was docketed to this Court's term beginning in December 2020 and submitted for a decision on the briefs.

to prove a fact without also instructing the jury on the requirement that an accomplice's testimony must be corroborated. We agree and reverse.[2]

1. The evidence at trial showed the following.[3] Pett met Deron Wallace and Pindling in the ammunition section of an Academy Sports store on July 2, 2013. On the afternoon of July 13, Pett and his sister drove to a location where he said he was to meet some men from New York that he had previously met at Academy Sports. On the way to the meeting, Pett received a call from a woman (later identified as Kathryn Cortez) saying that the meeting would be delayed. Pett and his sister returned home. Pett left again later that night but did not tell his sister where he was going. She never saw him alive again.

---

[2] Pindling also enumerates another error. Given our reversal of his conviction, we need not decide that other claim today because it is unlikely to reoccur on retrial.

[3] Because this case turns on whether an error likely affected the outcome of the trial, we present the evidence as reasonable jurors would have viewed it, rather than in the light most favorable to the jury's verdicts.

That night, a police officer found Pett's dead body on the back porch of a house at 213 Walnut Street in Valdosta. Pett was shot three times, once in the shoulder and twice in the back, and died as a result of the gunshot wounds. One police officer examined the contents of Pett's cell phone and found text messages directing Pett to the area; phone records showed that those text messages came from a phone number linked to Wallace. The phone records also showed a series of calls and text messages exchanged between Wallace's phone and Pett's throughout July 13, and that Wallace's phone number made several calls to different rental car agencies on July 12.

Further investigation revealed that Pindling and Wallace visited a rental car agency on July 12, and Pindling completed an application for a rental car, which Cortez paid for in part. Police officers obtained and executed a search warrant for the address Pindling listed on the application. Police officers found, among other things, a gun that belonged to Pett in a rear living room that connected to Pindling's bedroom; police officers found a

3

disassembled, silver-colored handgun hidden in a chimney in Pindling's bedroom. The gun recovered from Pindling's bedroom was later reassembled for ballistics testing and discovered to be the same gun used to shoot and kill Pett.

Police tracked the rental car using the vehicle's GPS device, noting that the vehicle traveled to New York. Police conducted a stop of the car once it returned to Georgia. Inside the car were Pindling, Wallace, Cortez, and another woman from New York. Police searched the rental car but did not find any of Pett's possessions. Pindling and Wallace were arrested. Wallace waived his *Miranda*[4] rights and agreed to speak to a detective. Wallace admitted being involved in crimes against Pett, but claimed that he was not the shooter and did not know anyone else was going to shoot Pett.

Cortez was also arrested following the traffic stop but was soon released. She later agreed to be interviewed by the police, initially denied participating in the armed robbery of Pett, but later admitted that she was the "bait" that lured Pett to the back of the house for

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

the purpose of robbing him. Cortez said that she took direction from Wallace.

Cortez provided more details about the crimes at the joint trial of Pindling and Wallace, testifying as follows. Soon after Pindling and Wallace began working at the same restaurant where Cortez worked, she began a relationship with Wallace. Pindling and Wallace said they were both from New York and described themselves as cousins. They lived at the same property address. Cortez said that Wallace lived in quarters separate from the main house that Pindling shared with his father. Cortez had seen Wallace and Pindling shoot a silver-colored gun at their residence.

Cortez also testified that to help pay for their planned trip to New York, she, Pindling, and Wallace devised a plan to rob Pett, who previously had sold marijuana to Pindling and Wallace. Wallace called Pett under the guise of purchasing marijuana and directed Pett to meet at an abandoned house located at 213 Walnut Street. Cortez, Wallace, and Pindling went to the location, but when they saw a woman standing nearby, they decided to cancel the meeting.

Cortez talked to Pett, but did not give him another time to meet. The trio returned home, and Pindling went to the liquor store. Later, Wallace called Pett to meet, and Cortez, Wallace, and Pindling again went to the abandoned house on Walnut Street.

Cortez waited in front of the house for Pett and directed him to the back porch; Wallace was on the back porch waiting, and Pindling was inside the house. Pett gave her marijuana, and as she looked at it, she heard gunshots. Cortez ran back to the car. Wallace took Pett's bag that contained Pett's wallet and a handgun and left the scene with Cortez and Pindling. Cortez did not see who shot Pett, but assumed that Pindling was the shooter because Wallace did not have a gun and Pindling was the only other person with them. When Pindling returned to the car, he said that he "kicked [Pett's] lights out because he was making noises."

After leaving the scene, the trio returned to Pindling and Wallace's residence. Cortez and Wallace sat in the living room connected to Pindling's bedroom, while Pindling hid the guns in his bedroom and changed, placing his clothes and Pett's wallet in a

6

trash bag. The trio left for New York; while there, Wallace would not let Cortez talk to her mother privately. Cortez said initially that both Pindling and Wallace threatened to kill her if she told anyone what happened, but later testified that only Wallace had threatened to kill her.

Pindling testified in his own defense. He said that Wallace stayed in Pindling's father's house and was allowed to use Pindling's gun whenever he wanted. On July 13, Pindling had been drinking liquor to celebrate his birthday and did not know that Wallace and Cortez had been texting Pett. In the evening, Wallace asked for keys to the rental car so he and Cortez could meet someone who owed Cortez money. Pindling continued to drink, fell asleep, and was awakened when Cortez and Wallace returned. Wallace and Cortez said they got the money and were ready to leave for New York, and Wallace gave Pindling's gun back to Pindling. Before leaving for New York, Pindling hid the gun, explaining that he did not want to take it to New York and did not want his father to find it. Pindling claimed not to have seen Pett's gun.

2. Pindling argues that the trial court plainly erred in failing to instruct the jury on the need for an accomplice's testimony to be corroborated. Pindling asserts that the error affected the outcome of his trial because Cortez was the sole testifying witness with personal knowledge of the events that led to Pett's death and was the only witness who implicated Pindling as the shooter. We agree that the trial court's error requires reversal.

As Pindling concedes, because he did not request this instruction and failed to object to its omission, his claim of error is reviewed only for plain error. See *Wilson v. State*, 301 Ga. 689, 693 (3) (804 SE2d 54) (2017). To establish plain error, Pindling must demonstrate that (1) the failure to give the instruction was not affirmatively waived, (2) the failure was an obvious error beyond reasonable dispute, (3) the error likely affected the outcome of the proceedings, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. See *Hood v. State*, 303 Ga. 420, 425-426 (2) (a) (811 SE2d 392) (2018). "Satisfying

8

all four prongs of this standard is difficult, as it should be." Id. at 426 (2) (a) (citation and punctuation omitted).

The State rightfully concedes that Pindling has satisfied the first two prongs of the plain error test, in that it was a clear and obvious error for the trial court to fail to give the accomplice-corroboration instruction while giving the single-witness instruction. The plain language of OCGA § 24-14-8 provides that in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient" to establish a fact, but "corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]" Under this statute, if there is evidence that could support a finding that a witness was an accomplice to the crime, and that witness provides testimony that directly links the defendant to the crime, it is a clear and obvious error for the trial court to instruct the jury that the testimony of a single witness is sufficient to establish a fact without also instructing the jury that an accomplice's testimony must be corroborated. See, e.g., *Doyle v. State,* 307 Ga. 609, 613 (2) (b) (837

9

SE2d 833) (2020); *State v. Johnson*, 305 Ga. 237, 240 (824 SE2d 317) (2019). Here, the prosecutor relied heavily on the testimony of Cortez, there was ample evidence from which the jury could have found her to be an accomplice, and her testimony directly linked Pindling to the crimes.

The parties dispute whether this error likely affected the outcome of the trial. As Pindling points out, Cortez was the only eyewitness who affirmatively linked him to the crimes and identified him as the shooter. The State argues that Cortez's testimony was corroborated by Wallace's statement, cell phone records, GPS records, surveillance videos, eyewitness testimony, and forensic evidence. But most of the evidence cited by the State corroborates Cortez's statements only as to her and Wallace's involvement in the crimes. And although it is not disputed that Pindling once met Pett at an Academy Sports, Pett's sister did not identify Pindling as one of the men that Pett had planned to meet (but did not) several hours before his death. Eyewitness testimony and other evidence do show that Pindling was with Wallace and Cortez for periods before and

10

after the crimes, but other than Cortez's testimony, there was no direct evidence — no cell phone records, forensic evidence, or eyewitness testimony — placing Pindling at the scene of the murder. The evidence cited by the State was legally sufficient to meet the "slight" requirement for corroboration to support a finding that Pindling was involved in the crimes against Pett. See *Raines v. State*, 304 Ga. 582, 587-588 (2) (a) (820 SE2d 679) (2018) (explaining that under Georgia statutory law, to sustain a conviction based on accomplice testimony, the independent corroborating evidence only has to be "slight" and can be entirely circumstantial). But that evidence was far from overwhelming.

Because almost all of the evidence incriminating Pindling came from Cortez, and the jury was never told that her testimony may have required corroboration or instructed how to evaluate properly the other evidence in this context, the outcome of the proceedings was likely affected by the trial court's failure to instruct the jury on the accomplice-corroboration requirement. See *Doyle*, 307 Ga. at 613-614 (2) (a), (b) (failure to give charge likely affected outcome of

11

the trial where the testimony of a witness who could be found to have been an accomplice was the only eyewitness to identify the defendant as a participant in the shooting, no other evidence placed the defendant in the vicinity of the crimes, and independent evidence was not strong enough to connect the defendant to the crimes); *Johnson*, 305 Ga. at 241 ("[B]ecause virtually all of the incriminating evidence flowed from [the accomplice], the outcome of the trial court proceedings was likely affected by the trial court's failure to provide an accomplice corroboration charge to the jury[.]" (punctuation omitted)); *Stanbury v. State*, 299 Ga. 125, 131 (2) (786 SE2d 672) (2016) (the trial court's failure to give an accomplice-corroboration charge likely affected the outcome of the trial when the accomplice "was the only witness who affirmatively identified [the defendant] as the second man" inside the house where the victim was robbed and shot); see also *Finney v. State*, 311 Ga. 1, 11 (3) (b) (855 SE2d 578) (2021) (reversing based on cumulative effect of evidentiary errors and failure to give accomplice-corroboration charge while giving the single-witness charge because the strongest

12

evidence of guilt came from accomplice's hearsay statements that were improperly admitted and the jury was effectively told it could find the defendant guilty based on the accomplice's statements alone).

Having found that the first three prongs of the plain error test have been met, we must next decide whether the error affected the fairness, integrity, or public reputation of judicial proceedings. See *Hood*, 303 Ga. at 425-426 (2) (a). We have concluded in similar circumstances that the failure to give the accomplice-corroboration charge undermines the fairness of the proceedings. See *Doyle*, 307 Ga. at 615 (2) (b) ("Affirming [the defendant's] conviction on this record with a jury that was authorized to find him guilty solely on [the accomplice's] testimony would render the accomplice-corroboration requirement meaningless."). We reach the same conclusion here. Because Pindling has established plain error, we reverse.

*Judgment reversed. All the Justices concur.*
Decided April 5, 2021.
Murder. Lowndes Superior Court. Before Judge Hardy.

13

*Matthew K. Winchester*, for appellant.

*Bradfield M. Shealy, District Attorney, Catherine H. Helms, Michelle T. Harrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General,* for appellee.